**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-cr-00326-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LEONEL CASTILLO,

      Defendant.

_____

**RESPONSE TO THE DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT
[ECF 50]**
_____

The United States of America respectfully files this response to the defendant's objections to the presentence report. ECF 50. The government agrees with the calculations in the presentence report [ECF 51] as well as probation's additional reasoning in its addendum [ECF 52].

**Response to paragraph 52 objection [ECF 50, ¶ 3]:** The government agrees with the presentence report's calculation of a base level of 20 under USSG § 2K2.1(a)(4)(B) at paragraph 52. Under the preponderance standard applicable here, "the offense involved" either or both a "semi-automatic firearm that is capable of accepting a large capacity magazine" as well as a National-Firearms-Act prohibited firearm described in 26 U.S.C. § 5845(a).

The presentence report's calculation relies on paragraphs 54 through 57 to support the base level, each paragraph's describing the defendant's involvement with a different

1

weapon. The defendant challenges each of those paragraphs one-by-one. ECF 50, ¶ 3. If the Court finds one or more of events in paragraph 54 through 57 proven by a preponderance, the base level of 20 applies. In the reverse, the Court must sustain the defendant's objections to all four paragraphs for the base level of 20 to not apply.

The government reasons that the Court should look at all conduct in all those paragraphs as a whole under 18 U.S.C. § 3661: each event is not a mere misunderstanding of a sale of a legal weapon or a misinterpretation of an otherwise innocent message exchange with a customer. Rather, each paragraph corroborates and lends reliability to the other paragraphs. In other words, given there are not one but four examples of illegal weapons'[1] being sold, the defendant was more-likely-than-not engaged in the sales of all the illegal weapons.

The Court should also consider the context in which the conduct in the paragraphs arises. The defendant was engaged in underground raffles of firearms for profit, dealing desirable firearms to his participants in a clandestine manner. He communicated (through Facebook messenger) with his raffle participants directly, lending credibility to those messages highlighted in the paragraphs. He also appears to have a strong working knowledge of the firearms that he was dealing, also displayed in his Facebook messages. By common sense, the defendant was not living by the letter of the law when conducting his scheme and it follows that he slipped into raffling illegal weapons as well. Accordingly,

---

1     High-capacity magazines are illegal under Colorado state law, C.R.S. § 18-12-302. Firearms described in 26 U.S.C. § 5845(a) are illegal without compliance with tax law described in the same title, including registration in the National Firearms Registration and Transfer Record.

looking at the conduct in paragraphs 54 to 57 as a whole and in context, the defendant was also involved in dealing illegal weapons such as the extended magazines and NFA-prohibited firearms described in paragraphs 54 to 57.

**Response to paragraph 54 objection [ECF 50, ¶ 3(A)]:** This objection could impact the advisory guideline range. The government agrees with the paragraph in the presentence report: the offense involved a raffling of a drum magazine to C.N., which was further "attached or in close proximity" to a semiautomatic Glock handgun. *See United States v. Bellamy*, 925 F.3d 1180, 1184 (10th Cir. 2019) (articulating the well-established standard for determining whether a firearm is "capable of accepting a large capacity magazine" under the base level).

The government submits exhibits here in support, Exhibit 1-3.[2] The defendant communicated with C.N. directly about the Glock model G42 .380 caliber handgun bearing serial number AGTB194[3] won in a raffle to be picked up at M.A.O. Ex. 1 pp. 3-4, Ex. 2 (Facebook message chain showing raffle win and coordinating pick up at M.A.O.). The defendant included a picture of the gun in his messages, which displayed at least one standard magazine and an extended drum magazine included with and "attached or in close proximity" with the gun. *See* Ex. 1, p. 4; Ex. 2, pp. 2-3. Corroborating directly that a drum magazine was included with the gun, the defendant stated in the Facebook message that he purchased the drum clip to include as a package, corroborating that the

---

2    Except Exhibit 3, all exhibits have been previously discovered to the defendant. Exhibit 3 captures a publicly accessible website.
3    Clearly displayed in the photograph, the Glock model G42 is a semiautomatic firearm. Glock does not manufacture non-semiautomatic handguns.

picture of the gun and accessories he sent in the photograph were the items won by C.N. Ex. 2, p. 9. The drum magazine appears to be a Promag brand 32-round magazine. *See* Ex. 3 (Promag website).

That handgun was recovered in the defendant's possession, showing the gun in fact made it into C.N.'s possession (after a straw transfer). Ex. 1, p. 1. While it did not have the drum magazine when recovered, drum magazine are not permanent attachments but are easily removeable. Accordingly, the facts, as supported by the exhibits, establishes that more-likely-than-not that the offense—unlawful dealing of firearms—involved a semiautomatic firearm capable of accepting a large capacity magazine.

**Response to paragraph 55 objection [ECF 50, ¶ 3(B)]:** This objection could impact the advisory guideline range. The government agrees with the paragraph in the presentence report.

The government submits an exhibit here in support, Exhibit 4. The defendant Facebook messaged a photograph to B.M. of an AR-style firearm that was being raffled. *See* Ex. 4, pp. 3, 15-16. That firearm appeared to be in the defendant's possession in the photograph. ATF Special Agent Jason Clemens reported that he observed the selector switch (the little tab shaped like ⬧ in the middle of the lower receiver) pointed backwards (the little tab, not the big tab, on the selector points the direction), which is consistent with a fully automatic firearm. *Id.* p. 3.

Special Agent Clemens' observation is not without corroboration. The defendant messaged that photograph while asserting that it had a "switch," a term that commonly

4

describes a device that converts a firearm into a machine gun. *Id.* Accordingly, more-likely-than-not, the defendant raffled or intended to raffle a fully automatic firearm meeting the definition of a machine gun at 26 U.S.C. §§ 5845(a)(6) and 5845(b). The fact that the firearm was not recovered does not preclude that the defendant both possessed as well as intended the rifle to be dealt through his raffle, supporting the base level of 20.

**Response to paragraph 56 objection [ECF 50, ¶ 3(C)]:** This objection could impact the advisory guideline range. The government agrees with the paragraph in the presentence report.

The government submits an exhibit here in support, Exhibit 5. The defendant Facebook messaged a photograph by of firearm with a companion extended magazine to S.O., indicating that it was in his possession: "I'll let you know how good it shoots." Ex. 5. The defendant also indicated that this firearm was intended to be S.O.'s and that it included an "extended" magazine, common verbiage for a magazine that holds more than 15 rounds: "I was scared driving home though they gave *you* an extra extended clip and some bullets." *Id.* (emphasis added). In context of the defendant's scheme, the government concludes that the defendant purchased this firearm from an FFL with whom he was working, the "they" in the message, to be given as a prize to S.O. The fact that the firearm was not recovered does not preclude that the defendant's scheme involved the extended magazine.

Thus, while being founded on less evidence than the other paragraphs, the government asserts that more-likely-than-not the defendant raffled or intended to raffle an extended magazine to S.O.

**Response to paragraph 57 objection [ECF 50, ¶ 3(D)]:** This objection could impact the advisory guideline range. The government agrees with the paragraph in the presentence report.

The government submits an exhibit here in support, Exhibit 6. J.M. participated in the defendant's raffles, acquiring firearms. J.M. relinquished all firearms that he had acquired from the defendant, including the Stribog model SP9A1 rifle bearing serial number GSA28266. Ex. 6; ECF 34, ¶¶ 43, 44 (indicating the same). J.M. stated that the rifle, when giving it to ATF agents, was in the same configuration as he had acquired it (from M.A.O., an FFL with whom the defendant worked [e.g. ECF 34, ¶ 10]), meaning J.M. did not convert the barrel to be less than 16 inches after acquiring it. Ex. 6, p. 2. Seizing the weapon from J.M., Special Agent Clemens directly observed the firearm was in fact a rifle with a barrel less than 16 inches despite being recorded as a pistol in M.A.O.'s records.[4] The fact that J.M. received the firearm from M.A.O., the defendant's associate in his raffles, shows that the firearm was received through the defendant's raffle scheme.

Thus, more-likely-than-not, the defendant raffled a firearm to J.M. that meets the definition of a short-barrel rifle at 26 U.S.C. § 5845(a)(3).

**Response to paragraph 59 objection [ECF 50, ¶ 6]:** This objection could impact the advisory guideline range. The government agrees with the paragraph in the

---

4      Investigation into M.A.O. revealed that the owners C.S. and A.G. (referenced in the paragraph) kept falsified records. *See United States v. C.S.*, District of Colorado case no. 24-cr-00034-GPG [ECF 21, pp. 9-10]; *United States v. A.G.*, District of Colorado case no. 24-cr-00224-GPG [ECF 22, pp. 8-10].

presentence report. The enhancement does not call for the Court to develop a precise count of firearms involved in the offense. Rather, it requires the Court to determine whether the defendant more-likely-than-not engaged in dealing at least 100 firearms. The evidence, while not precise, supports that the defendant did engage in high volume gun sales to justify the enhancement.

The defendant objection primarily challenges W.P. of O.A.'s credibility that he sold approximately 100 firearms to the defendant and was paid $12,000 when interviewed by ATF agents. *See also* ECF 34, ¶ 24. In essence, the defendant's objection asserts that W.P. was incorrect, implying that he sold the defendant fewer firearms than needed to meet the 100-to-199 enhancement that has been applied under § 2K2.1(b)(1)(D) when combined with firearms from M.A.O. and C.A. He also claims that the enhancement may have double or triple counted firearms that were bought through O.A. or M.A.O.

At threshold, the government acknowledges that the 20 firearms J.M. acquired from (not for) the defendant's raffles may have been originally sourced from O.A. or M.A.O., [Ex. 6], and these could be included in the counts provided by C.S. and W.P. such that they could be double counted. Thus, the government does not include those firearms in the overall count. That said, C.A. never bought any firearms from O.A. or M.A.O., so firearms he purchased for the defendant cannot be double counted.

From there, the government submits an exhibit here in supporting W.P.'s interview conducted on May 23, 2023. Ex. 7. Indicia of reliability of that interview demonstrate the probable accuracy that the defendant purchased a high-volume of firearms from O.A. *See United States v. Padilla*, 793 Fed. App'x 749, 757 (10th Cir. 2019).

7

First, W.P. made his admissions when first contacted by the agents on May 23, 2023, and before he had retained an attorney. *See* Ex. 7, ¶ 14. It is likely that he was under stress at that point of being confronted and not likely to have given sufficient thought to crafting a lie. This is shown by subsequent inquiries by the ATF in which W.P. was no longer willing to provide information. *See id.* After having sufficient time to think, W.P. began to hide his dealings. This only makes sense because W.P. had dealings to hide— high volume of sales to the defendant that were being investigated by the ATF.

Second, in his interview, W.P. admitted that he was already in contact with the defendant about an ATF investigation, demonstrating that he had a close relationship with the defendant based on a mutual business interest that was under ATF scrutiny. Ex. 7, ¶ 5. This admission further suggests that their relationship was not founded on mere incidental dealings, as the defendant wishes the Court to believe in his objection.

Third, W.P. admitted that the transactions were all in cash, which shows that he was forced to rely on his memory and not records in the moment. His memory indicated to him that he had sold a high volume of firearms to the defendant, not an incidental or middling amount. It stands to reason that W.P. would have described a smaller number when confronted by federal agents if the volume was in fact low. While the information he did provide—around 100 guns for $12,000 to the defendant—is admittedly not precise, it is reliable insofar as it describes a high volume of firearms sold, at least to a degree that supports the enhancement. On this reasoning, the government finds that it is equally probable that O.A. sold *even more than* 100 firearms to the defendant.

Fourth, W.P. was unwilling to provide records to the ATF and waffled when asked on June 7, 2023 for a list of customers. Ex. 7, ¶ 16. The defendant attempts to use the lack of records here to his advantage to cast doubt. ECF 50, ¶ 6. But to the contrary, the government asserts that W.P.'s subsequent attempts to hide his dealings (and not provide records) show that he was involved in a high volume with the defendant such that he began to hide evidence that could directly implicate him. Overall, the W.P.'s count of "around 100," is reliable to support the enhancement and cannot be discounted.

The defendant also argues that C.S. of M.A.O. provided an inaccurate number of raffle participants, suggesting that M.A.O. counted customers that were not for firearms. ECF 50, ¶ 6. The sheer volume of confirmed firearm transactions—$49,008—contradicts the defendant's view. ECF 34, ¶ 45.

But the defendant uses the discrepancy in the payments, $12,000 to O.A., and $49,008 to M.A.O. to question their overall reliability. ECF 50, ¶ 6 ("…100 firearms is illogical because …). In doing so, the defendant assumes that similar firearms were purchased from both. The two gun stores had differing inventories, however. Special Agent Clemens will be available at sentencing to state that, overall, M.A.O. engaged in sales of pricier, fancier firearms such as custom AR-style rifles than did O.A.'s inventory of older firearms.[5] The discrepancy is not "illogical;" it is instead borne out in M.A.O.'s and O.A.'s differing firearms. As he did through O.A., the defendant purchased a high volume of firearms for raffles through M.A.O. to support the enhancement.

---

[5] M.A.O. engaged in manufacturing rifles without the required manufacturing federal firearms license, many of which had special features and custom paint jobs. This was among the criminal conduct targeted in the owners' cases. *See* fn. 4, *supra.*

Accordingly, the evidence supports that defendant purchased a high volume of firearms purchased from W.P. at O.A. and C.S. at M.AO., that, when combined with firearms purchased from C.A., justifies the enhancement at § 2K2.1(b)(5)(D). *See* ECF 34, ¶ 59. The defendant more-likely-than-not unlawfully dealt at least 100 firearms.

DATED this 31st day of December, 2024.

<div style="margin-left:40%">

MATTHEW T. KIRSCH
United States Attorney

*s/ Albert Buchman*
ALBERT BUCHMAN
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Al.Buchman@usdoj.gov

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2024, I electronically filed the foregoing **RESPONSE TO THE DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT [ECF 50]** document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

s/ *Stephanie Graham*
STEPHANIE GRAHAM
Legal Assistant
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100